## GILMAN & SANBORN v. HILL.

If the sale of goods consist of a number of articles at the same time, neither of which is of the price of $33, but which in gross exceed that sum, the contract is deemed to be entire, and to fall within the statute of frauds.

To take a case out of the statute of frauds, acceptance and actual receipt by the buyer of goods verbally bargained for must be shown.

If upon a sale of chattels anything remains to be done, as between the vendor and vendee, before the goods are to be delivered, a present right of property does not attach in the vendee. And where the sale is by number, weight or measure, it is incomplete until the specific property is separated and identified.

In trover the general rule is, that assuming to one's self the property and right of disposing of another man's goods, is a conversion.

An officer, who has a writ against a party whose goods are mixed with those of a third person, does not make himself liable as a trespasser by the mere act of attaching the whole.

The defendant, who was an officer, having a writ against one G., on the 22d day of August attached property of his, which was intermixed with similar property of the plaintiffs. On the same day, after the attachment, he was informed of the plaintiffs' claim, but subsequently removed the whole property without making any inquiry as to the interest of the plaintiffs, or attempting to separate the goods. On the 31st day of August the plaintiffs commenced an action of trover against the defendant. In November following, the defendant advertised and sold the whole property as the property of G. — *Held,* that the evidence was competent to show a conversion, without showing a demand and refusal.

TROVER, for ninety-three wool pelts, of the value of fifty cents each, alleged to have been converted by the defendant on the 29th day of August, 1855. Plea, the general issue. The writ was dated August 31, 1855.

The plaintiffs were partners, doing business under the name and style of Gilman & Sanborn.

The plaintiffs called one Samuel F. Gilman as a witness, who testified substantially as follows :. The plaintiffs were partners in August, 1855. I then resided at Gilford, and was carrying on the butchering business in that place, in a slaughter-house owned by said G. H. Gilman. The defendant came there to the shop, and took ninety-three pelts and carried the same away about the 23d of August, 1855. These pelts were at the time the property

of the plaintiffs, Gilman & Sanborn. I was not present when the defendant took the pelts, but met him the same day and soon after he had taken them, when he informed me that he had taken them as my property. I told the defendant that they did not belong to me, but were the property of the plaintiffs. The defendant hauled the pelts over to the Bridge, (in Meredith,) and put them into the store-house of one Burnham, where he kept them until the next fall, when he sold them at auction. Such pelts were selling for fifty cents each at the time the defendant took them in August, but at the time when he sold them (in November after,) they were selling at sixty-two and one half cents each. At the time said pelts were taken by the defendant, a part of them were in the shed attached to said slaughter-house, and a part on the fence, close by. I had once owned said pelts ; took them from lambs that I bought and killed at G. H. Gilman's slaughter-house. I sold said pelts to Gilman & Sanborn about the 10th of August, 1855. Sanborn traded with me for them, but bought them for the company, as I understood him at the time. The sale was made at the market in Laconia, and was a sale of all the *first season* pelts, such as had been or should be taken off from July 1 to October 1. Sanborn asked me what I would take for my pelts. I told him fifty cents each, and Sanborn said they would take them. At the time of the sale there had been about eighty pelts taken off. About seventy of these were under the shed and the rest upon the fence. The next day after the sale Sanborn and myself went and counted over all the pelts then off, took those that laid in the shed, and handled them all over, moving them from one end of the shed to the other, laid them up in piles, and brought in such as were dry enough, from the fence, and put them on the piles with the others. After this time, and before the defendant took them, there had been thirteen other pelts taken off. These were not kept separate from the others, but were first put on the fence to dry, and when dried put upon the piles with the rest. I was bound to let the plaintiffs have all the pelts which I had taken off since July 1st, and all that I should take off from the time of sale to the

1st of October, at fifty cents each, as I understood the bargain, and they were bound to take them all at that price. I had had several talks with Sanborn about selling the pelts, within one or two weeks previous to the sale. I do not recollect as anything was said at the sale about taking the pelts away. At the time of the sale Sanborn paid me in part for the pelts. He had let me have a cow previous to that, for which I owed him $30; had also let me have $20 in cash. At the time of sale it was agreed that these sums should be allowed toward the pelts. I also had another cow of the plaintiffs after the sale and before the defendant took the pelts. I had not given any notes for the cow, or cash. There were two houses belonging to the said G. H. Gilman, and this shed was between them. One of the houses was the slaughter-house in which I carried on business. I hired a market of G. H. Gilman. I bought out one Dow, who had been engaged in butchering there before me, and I understood from him that I could continue to butcher there in Gilman's slaughter-house. Gilman never objected to my doing so, though there was nothing ever said between us about it. I had no lease of any part of these premises in Gilford, nor was I to pay any rent for what I occupied, to any one. Gilman and Sanborn occupied whatever of all these premises they wanted. G. H. Gilman occupied the shed that summer—occupied it with an old wagon. Gilman also occupied a part of the slaughter-house to butcher in, and kept his farming tools in the buildings whenever he chose; kept some yokes and bows in the slaughter-house. We counted over the pelts the next day after the sale, to see how many there were of them; no other reason in particular. The reason why we moved them from one end of the shed to the other was, because the water ran in at the end where they were.

The defendant then introduced an original writ in favor of Lewis R. Morris, and against Samuel F. Gilman, returnable at the trial term of the Supreme Judicial Court for Belknap county, on the fourth Tuesday of October, 1855, and the original execution issued thereon. It appeared by the defendant's return upon said writ that he attached the pelts as the property of said

S. F. Gilman, on the 22d day of August, 1855 ; and from his return on said execution that he duly levied on said pelts on the 2d day of November, 1855, and thereafter sold the same upon said execution. It was not disputed that said writ was a valid writ of attachment, nor that the defendant was sheriff of the county of Belknap when he took and sold the pelts.

At the close of the testimony the defendant moved for a nonsuit, for the following reasons :

1. There is no competent evidence of any delivery of the pelts by S. F. Gilman to the plaintiffs.

2. It appears that the contract was not completed, something remaining to be done in order to determine how much was to be paid for the pelts ; that is, they must be counted the first of October.

3. The alleged contract was void by the statute of frauds, no part having been accepted and actually received, and nothing having been paid as earnest money, and the contract not having been in writing.

4. There is no evidence that the defendant, the creditor, or attorney in that suit, had any notice of the sale, and the property having been left in S. F. Gilman's possession, the sale was invalid so far as this attachment is concerned.

5. No demand on the defendant has been proved, and there is no evidence of a conversion.

6. The defendant had a right to take the pelts taken off after the sale, at all events, and they, being mixed with the other pelts, the plaintiffs cannot recover, because they have not proved a specific demand for the particular pelts on hand at the time they purchased.

7. It appears that if this was a valid contract, the plaintiffs had not a right to the possession of the pelts on the 31st of August, the date of the writ, and the action was prematurely brought.

8. If they had a right to the pelts when the suit was brought, still they did not become their property, and they could not have maintained trover for them, even against Gilman, but the claim rested in contract.

The court overruled the motion, and submitted the evidence to the jury, to which the defendant excepted.

The court instructed the jury that the plaintiffs would be liable under this contract to pay or allow S. F. Gilman at the rate agreed on, for whatever pelts had been taken off and delivered by S. F. Gilman to them, and received and accepted by them, and that the plaintiffs would have *such a property* in the pelts thus delivered, accepted and received, as would enable them to maintain trover for their conversion, and that the jury might first inquire and find upon the evidence whether *any*, and if so, *how many*, of the pelts here sued for had been thus delivered to the plaintiffs, and accepted by them, before they were taken by the defendant.

And upon the question of *conversion*, that they should inquire and find, upon the evidence, in whose possession the pelts thus taken by the defendant were at the time of the taking, whether in that of S. F. Gilman or that of the plaintiffs, or a part in the possession of each; and that there was competent evidence from which the jury might find a conversion by the defendant of such pelts as were taken by him from the possession of the plaintiffs, and that they might return their verdict for the plaintiffs for damages equal to the value of *such pelts, and such only*, as they should find had been delivered by S. F. Gilman, and accepted by the plaintiffs, before the taking by the defendant; and for such and such only as they should find had also been taken by the defendant from the possession of the plaintiffs. And that if none of the pelts had been thus delivered and accepted, nor were also thus taken from the possession of the plaintiffs, then their verdict might be for the defendant. To which instructions the defendant excepted.

The jury having returned a verdict for $46.50, damages, being for the conversion of ninety-three pelts, of the value of fifty cents each, with interest, upon which judgment was rendered, the defendant filed his bill of exceptions, which was allowed by the court.

*E. A. Hibbard*, for the defendant.

1. The motion for a nonsuit should have prevailed.

. There was no evidence in the case that tended to show a delivery and acceptance of any of the pelts. *Messer* v. *Woodman,* 2 Foster 183 ; *Coburn* v. *Pickering,* 3 N. H. 415 ; *Trask* v. *Bowers,* 4 N. H. 309 ; *French* v. *Hall,* 9 N. H. 137 ; *Clark* v. *Morse,* 10 N. H. 236.

The contract was not completed, aside from any question about the delivery, something remaining to be done in order to determine how much was to be paid for the pelts ; that is, counting them the first of October. *Hanson* v. *Meyer,* 6 East 614 ; *Ward* v. *Shaw,* 7 Wendell 404. The contract was an agreement to sell, and not a sale. *Handlette* v. *Tallman,* 14 Maine 400 ; *Stone* v. *Peacock,* 35 Maine 386 ; *Messer* v. *Woodman,* 2 Foster 172 ; Chitty on Contracts (7th Am. Ed.) 175, and cases cited in notes.

The evidence does not show that the pelts were accepted and actually received in such a way as to make a valid contract under the statute of frauds. The defendant, creditor and attorney, having no knowledge of the alleged sale, it was fraudulent in law, and invalid. *Felton* v. *Fuller,* 29 N. H. (9 Foster) 128 ; *Ricker* v. *Cross,* 5 N. H. 570. If the transaction can be regarded as a sale of the eighty pelts, separate from the rest, then it was the negligence and laches of the plaintiffs not to take possession and remove them, and, as before stated, unless it can be so regarded it gave the plaintiffs no rights whatever.

A demand was necessary. *Barron & a.* v. *Davis & a.,* 4 N. H. 345. The original taking, even though unlawful, was waived by bringing this form of action, and there was no other evidence of a conversion.

The defendant had a right, at all events, to take the thirteen pelts put upon the piles after the alleged sale. Assuming that the plaintiffs made out a title to the eighty, the doctrine in relation to " confusion of goods" is directly in point as to the thirteen. *Lewis* v. *Whittemore,* 5 N. H. 366 ; *Bond* v. *Ward,* 7 Mass. 127 ; *Shumway* v. *Rutter,* 8 Pick. 447 ; *Ryder* v. *Hathaway,* 21 Pick. 306.

The action was prematurely brought. *Clark* v. *Draper,* 19

N. H. 421. In no event could the plaintiffs have a right to the possession of the pelts on the 31st of August, the date of the writ. They had no right of possession till October 1, and could maintain no suit till after that time.

2. The court should have directed a verdict for the defendant. The reasons given in support of the motion for a nonsuit are mostly applicable upon this point. There was no competent evidence which authorized the jury to find that any pelts had been delivered by Gilman to the plaintiffs, and received and accepted by them, or that any of the pelts were taken from the possession of the plaintiffs, and no competent evidence of a conversion. It certainly was not competent for the jury to include in their verdict the value of the thirteen pelts last taken off.

*Hutchinson*, for the plaintiffs.

EASTMAN, J. The contract between the plaintiffs and Samuel F. Gilman, as we understand it, was this: that the plaintiffs were to have all the pelts that Gilman should take off between the first days of July and October, 1855, at fifty cents apiece; and that they might take them from time to time, as they should become dry and fit for use.

This contract, being a verbal one, was within the statute of frauds; for at the time of the bargain eighty pelts had been taken off, amounting to $40, which exceeded, of course, the statute limit of $33, and the goods to that amount were then fit for delivery, acceptance and use.

There is a class of cases which hold that, where the thing contracted for at the time of the sale is not in *esse*, or is incapable of delivery and of part acceptance, the contract is not within the statute. Thus in *Groves* v. *Buck*, 3 Maule & Sel. 178, where it appeared that a contract had been made for the sale of a quantity of oak pins, which at the time of the sale were not cut out of the slabs, Lord *Ellenborough*, C. J., held that such a contract was not within the statute, upon the ground that the subject matter of the contract, at the time of making it, did not

exist in *rerum natura ;* and that it was incapable of delivery and of part acceptance. See, also, *Sewall* v. *Fitch,* 8 Cowen 215. And so with a contract to sell the improvements on land ; such improvements being held to be work and labor. *Lower* v. *Winters,* 7 Cowen 263 ; *Frear* v. *Hardenburgh,* 5 Johns. 275.

But in *Garbutt* v. *Watson,* 5 Barn. & Alderson 613, where a contract was made for the sale of flour, to be prepared by the sellers, who were millers, and to be afterward shipped to the buyer, it was decided to be within the statute ; and Mr. Justice *Bailey* observed, that this was substantially a contract for the sale of flour, and that it seemed to him immaterial whether the flour was at the time ground or not : That the question was whether the contract was for goods, or for work and labor and materials found, and that in his opinion it was the former. And so it has been determined that standing crops, not severed from the land, but ripe and fit to be gathered, when sold upon the terms of their being taken immediately, are to be deemed goods within the meaning of the statute. *Parker* v. *Stainland,* 11 East 362 ; *Warwick* v. *Bruce,* 2 Maule & Sel. 205 ; *Carter* v. *Jarvis,* 9 Johns. 143.

It appears to be now well settled, although some of the earlier cases held a different doctrine, that the statute applies equally to executory and executed contracts. *Rondeau* v. *Wyatt,* 2 H. Black. 63 ; *Cooper* v. *Elston,* 7 Term 14 ; *Bennett* v. *Hall,* 10 Johns. 364 ; *Crookshank* v. *Burrell,* 18 Johns. 58 ; *Sewall* v. *Fitch,* 8 Cowen 215. So that where the contract can be correctly said to be for a sale of goods, and not merely for work and labor, the statute applies.

If the sale be of a number of articles at the same time, neither of which is of the price of $33, but which in gross exceed that sum, the contract is deemed to be entire, and to fall within the statute. *Baldey* v. *Parker,* 2 Barn. & Cress. 37 ; Comyn on Contracts 85.

At the time of the contract between Gilman and the plaintiffs, eighty of the pelts had been taken off, and were dry and fit for use. They were therefore goods in *esse ;* and, understanding

Gilman & Sanborn *v.* Hill.

the contract as we do, that the plaintiffs might take the pelts as they became suitable for use, and as they might wish, there is no embarrassment in the case arising from the position that the property in question was not at the time of the sale in a situation to be the subject of delivery and acceptance. And upon the doctrine of *Garbutt* v. *Watson,* and *Rondeau* v. *Wyatt,* and *Cooper* v. *Elston,* there would seem to be no doubt that the statute would apply to all that might be taken off during the season. It was not a contract for work and labor to be performed, but for the goods—the pelts themselves.

Neither is there any doubt of the application of the statute, arising from the terms of the sale, it being by the piece; for the contract was for all that had been taken off, and for those that might be. The payment being by the piece was only the manner of ascertaining the value of all that should be taken.

The contract, then, being within the statute of frauds, the goods, or a part of them, must have been accepted by the plaintiffs, and have been actually received by them, or payment must have been made so as to bind the bargain, otherwise the property did not pass from Gilman to the plaintiffs ; and if it did not pass, then the plaintiffs must fail in their action.

The instructions given by the court to the jury were plain and explicit, and appear to have been correct ; that in order to give the plaintiffs a property in the articles, they must have been "delivered, accepted and received." The fact that, at the time of the bargain, it was agreed between the parties that the $50 for the cow, and money previously received, should be allowed towards the pelts, seems not to have been regarded by the court as a payment answering the requirements of the statute, and thus was not alluded to. And this we think was the right view of the matter. It was not an act done, a payment actually made, but simply an agreement that the sum should be allowed; a matter resting in contract only.

Upon the instructions given the jury found a verdict for the ninety-three pelts ; and if there was evidence competent to be

submitted to the jury, and to warrant the finding, the verdict, if not objectionable upon other grounds, must stand.

We have in our own Reports several cases where the question of the sufficiency of the delivery and acceptance of goods has been considered, and the authorities collected.

If upon a sale of chattels anything remains to be done, as between the vendor and vendee, before the goods are to be delivered, a present right of property does not attach in the vendee. And where the sale is by number, weight or measure, it is incomplete until the specific property is separated and identified. *Davis* v. *Hill*, 3 N. H. 382 ; *Messer* v. *Woodman*, 22 N. H. (2 Foster) 172 ; *Warren* v. *Buckminster*, 24 N. H. (4 Foster) 336.

And to take a case out of the statute of frauds, acceptance and actual receipt by the buyer of goods verbally bargained for, must be shown. *Shepherd* v. *Pressey*, 32 N. H. 49 ; *Messer* v. *Woodman*, 22 N. H. (2 Foster) 172.

These positions are sustained by the following among other authorities : *Simmons* v. *Swift*, 5 Barn. & Cress. 857 ; *Hanson* v. *Meyer*, 6 East 614 ; *Macomber* v. *Parker*, 13 Pick. 183 ; *Ward* v. *Shaw*, 7 Wendell 404 ; 2 Kent's Com. 495, 96 ; *Austin* v. *Craven*, 4 Taunton 644 ; *Hunt* v. *Hecht*, 20 E. L. & Eq. 524 ; *Phillips* v. *Bistolli*, 2 Barn. & Cress. 513 ; Chitty on Contracts 375.

In *Macomber* v. *Parker*, 13 Pick. 183, the court lay down the rule upon the first position thus : " The general principle is, that where any operation of weight, measurement, counting, or the like, remains to be performed, in order to ascertain the price, the quantity, or the particular commodity to be delivered, and to put it in a deliverable state, the contract is incomplete until such operation is performed. But where the goods or commodities are actually delivered, that shows the intent of the parties to complete the sale by the delivery ; and the weighing, measuring, or counting, afterwards, would not be considered as any part of the contract of sale, but could be taken to refer to the adjustment of the final settlement as to the price."

To satisfy the statute of frauds there must be not only a deliv-

ery by the seller, but an *actual acceptance* by the buyer.   And there is no acceptance unless the purchaser has exercised his option to receive the goods or not, or done something that has deprived him of his option.

Upon these principles we think the evidence was competent to be submitted to the jury, and from which they might find a delivery and actual acceptance of the eighty pelts on hand at the time of the contract.  These were counted over by Gilman and one of the plaintiffs, on the day after the sale, and laid up in piles in the shed belonging to the other plaintiff.  This shed was occupied chiefly by the plaintiff; and the witness Gilman appears not to have had any possession either of the shed or the slaughter-house except a partial one, by sufferance, and without paying rent; and especially not of the shed where the skins were piled. When these pelts were counted over and piled up, nothing was said or done by the parties indicating that they were not accepted.   They were left quite as much in the possession of the plaintiffs as of Gilman.   And when we take into consideration the further fact, that money and property had been received by Gilman from the plaintiffs, to an amount exceeding the $40, which was agreed at the time of the contract should be allowed towards the pelts, it appears to us that the intent of the parties was plain, and that the evidence taken together was competent to show a delivery and actual acceptance of the eighty pelts.

But as to the thirteen we think the evidence was not competent to show a transfer of the property.   The most that can be made of it is this, that Gilman took off the pelts, counted them himself, and put them into the plaintiffs' possession.   The plaintiffs had never seen or examined them.   They had never counted them, or exercised the option of receiving them.   Moreover, Gilman did not attempt to deliver them.   He simply put them into the plaintiffs' shed, without any notice that they were there; and we do not see how the transaction can be distinguished in principle from the cases of *Shepherd* v. *Pressey*, *Davis* v. *Hill*, *Warren* v. *Buckminster*, and *Messer* v. *Woodman*, already cited.

So far, therefore, as the thirteen pelts are to be considered,

the property in them never passed to the plaintiffs ; and the defendant, having a valid suit of attachment against Gilman, the owner, could take them.

These thirteen were put upon the pile with the eighty, which the jury have found, upon competent evidence, had been delivered to the plaintiffs and been accepted by them, and that they were taken by the defendant out of the possession of the plaintiffs. Upon this finding, had the thirteen not been mixed with the eighty, there could be no doubt that an action of trover would lie against the defendant for the eighty, without demand, for he had no right to take the plaintiffs' property from their possession with a process against another, and it is only where a party obtains the possession of property lawfully that it is necessary to show a demand and refusal. *Hyde* v. *Noble & al.*, 13 N. H. 494 ; *Woodbury* v. *Long*, 8 Pick. 543 ; *Bates* v. *Conkling*, 10 Wendell 389 ; *Tompkins* v. *Haile*, 3 Wend. 406 ; *Galvin* v. *Bacon*, 2 Fairfield 28 ; *Lovejoy* v. *Jones*, 30 N. H. (10 Foster) 164.

Evidence of acts at any time before the commencement of the suit, which are inconsistent with the plaintiffs' rights and property in the goods, is competent to maintain the allegation of a conversion. The general principle is that assuming to one's self the property and right of disposing of another man's goods, is a conversion. *Parker*, C. J., in *White* v. *Phelps*, 12 N. H. 385.

But the authorities show that the thirteen, being mixed with the eighty, the defendant, as sheriff, had the right in the first instance to take the whole, and that in so doing he would not be a trespasser ; that the act of taking merely was not tortious. *Lewis* v. *Whittemore*, 5 N. H. 364 ; *Bond* v. *Ward*, 7 Mass. 123 ; *Shumway* v. *Rutter*, 8 Pick. 443 ; *Sawyer* v. *Merrill*, 6 Pick. 478.

The same authorities also show that, upon a demand and refusal, an action of trover could be maintained against the defendant for the eighty ; for although, having a legal process against Gilman, the law would justify his taking the whole, still he could not unreasonably detain what did not belong to Gilman. But in the present suit no demand and refusal were shown, and the question

Gilman & Sanborn *v.* Hill.

is presented whether the action can he maintained upon the evidence stated and the finding of the jury, without showing a demand and refusal—the original taking being justifiable.

It is said by Mr. Justice *Morton,* in *Ryder* v. *Hathaway,* 21 Pick. 304, that few subjects in the law are less familiar, or more obscure, than that which relates to the confusion of property; and this remark is quoted in *Barron* v. *Cobleigh,* 11 N. H. 561, where the question is approached but not discussed, it being unnecessary to be determined in the view which the court took of that case.

Where the goods of two persons are so intermixed that they can no longer be distinguished, each of them has an interest in the subject as tenants in common, if the intermixture was by consent.   But if A. willfully intermix his goods with those of B., so that it becomes impossible to distinguish what belonged to A. from what belonged to B., the whole belongs to B.   This rule, however, is carried no further than necessity requires; and if the goods can be easily distinguished and separated, then no change of property takes place.   And if the goods mixed together are of equal value, then the injured party takes his given quantity and not the whole.   But if the articles are of different value or quantity, and the original value cannot be distinguished, the party injured takes the whole.   It is for the party guilty of the fraud to distinguish his own property satisfactorily, or lose it.     2 Kent's Com. 364; *Lupton* v. *White,* 19 Vesey 432; *Hart* v. *Ten Eyck,* 2 Johns. Ch. 108; 15 Vesey 442; *Ryder* v. *Hathaway,* 21 Pick. 298; *Seavey* v. *Dearborn,* 19 N. H. 351.

Such are the general rules upon the subject, and the present case does not require a more minute examination.   These pelts were mixed by no direction or fault of the plaintiffs.   They were of equal value, and as between the plaintiffs and Gilman each party would take his given quantity.   The plaintiffs should therefore suffer no prejudice from the intermingling, nor be put to any inconvenience beyond what the rights of others require. In the cases to which we have referred, showing that trespass

against the officer will not lie for the taking, and that a demand and refusal is necessary before trover can be maintained, the property in dispute was all in the possession of the debtors, against whom the writs were made, and had become mixed with their goods by the indirect if not direct acts of the claimants themselves. Here, the goods were in the shed of one of the plaintiffs, and the jury have found that they were in his possession when taken ; so that the facts upon this finding are these : On the 22d of August the plaintiffs had in their possession eighty pelts, which were their property. With them were mixed thirteen others, belonging to Gilman, the debtor. This intermixture was without their fault. On that day the defendant took the actual number, the ninety-three, by virtue of a writ against Gilman, from the plaintiffs' possession. Soon after he took them, he was informed that they belonged to the plaintiffs, but, so far as the case shows, without making any inquiry as to the facts, he removed them to another place, and kept them until the next Fall, when he sold them at auction.

Were these facts competent evidence from which a jury might find a conversion ? It appears that this action was commenced on the 31st day of August, after the defendant had removed the goods, but before they were sold. If the suit had not been brought till after the sale by the defendant, the evidence would have been competent ; for the defendant, having been informed that the property belonged to the plaintiffs, could not excuse himself in selling it till he had made due inquiry as to the ownership, although he might be justified in the taking. A demand and refusal are not of themselves a conversion, but only evidence of a conversion. The assumption of authority over property, and an actual sale, constitutes a conversion. *White* v. *Phelps*, 12 N. H. 385 ; *Stevens* v. *Eames*, 22 N. H. (2 Foster) 568 ; *Tompkins* v. *Haile*, 3 Wendell 406 ; *Woodbury* v. *Long*, 8 Pick. 543.

In *Lewis* v. *Whittemore*, 5 N. H. 366, the court say, " If the plaintiff gave the officer notice of what interest he had in the corn, and demanded a return, trover may be maintained. If the

officer has sold the whole, after notice of the plaintiff's claim, that may be a conversion."

But the sale in this case was not made till after the suit was brought, and the plaintiffs must recover upon the facts as they existed at the commencement of the action. The act of selling, therefore, which of itself would show a conversion at the time it was made, would not be a conversion at the time of the commencement of the suit. It would, however, be evidence of the *quo animo* with which the property was held by the officer from the time of the taking. It would have a tendency to show that the defendant was assuming to hold the property for the creditor whose writ he had, in opposition to the rights of the plaintiffs, with the intention of selling it as soon as execution should be obtained against Gilman, the debtor; and that if a demand had been made before the suit against him, it would have been mere matter of form. The defendant had the right to demand an indemnity, and probably received one, and his acts are not to be censured. It was a question of property which the parties interested have chosen to litigate through him, and to this course there can be no objection.

Add to the fact of the sale that the property was attached in the possession of the plaintiffs, that the defendant was notified that it belonged to them, that it was removed without inquiry, to ascertain the plaintiffs' rights, and we think the evidence was competent to bring the case within the general rule laid down in *White* v. *Phelps*, already cited, and which is said, in *Moulton & Ladd* v. *Robinson*, 27 N. H. (7 Foster) 567, to furnish the true rule of the law, that here was an " assuming to one's self the property and right of disposing of another man's goods," which is a conversion.

The verdict was for the ninety-three pelts. To the extent of the eighty it was correct, but beyond that it was wrong. The case is brought here by exceptions, under the statute of 1855, and the result is, that the judgment must be affirmed for $40, with interest and costs of the court below, and reversed to the amount of $6.50, with interest and costs of this court.